**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KAREN BLACHOWICZ,<br><br>                    Plaintiff,<br><br>      v.<br><br>AIRGAS, INC.,<br><br>                    Defendant. | Civil Action No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## COMPLAINT FOR DECLARATORY AND PROSPECTIVE INJUNCTIVE RELIEF

KAREN BLACHOWICZ ("Plaintiff"), by and through undersigned counsel, seeks a permanent injunction requiring a change in AIRGAS, INC.'s ("Airgas", and "Defendant") corporate policies to cause its digital properties to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiff respectfully asserts as follows:

## INTRODUCTION

1.      This action arises from Defendant's failure to make its digital properties accessible to legally blind individuals, which violates the effective communication and equal access requirements of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189, N.Y. Exec. Law § 296, *et seq*., and the laws of New York.

2.      It is estimated that 2.3 percent of the American population lives with some sort of visual disability. *See* Erickson, W., Lee, C., von Schrader, S., Disability Statistics from the American Community Survey (ACS). Ithaca, NY: Cornell University Yang-Tan Institute (YTI), *available at* www.disabilitystatistics.org (last accessed January 17, 2023).

3.      For this significant portion of Americans, accessing digital platforms, mobile applications, and other information via their smartphones has become critical, especially during

1

the current COVID-19 pandemic. Indeed, this discrimination is particularly acute during the pandemic. According to the Centers for Disease Control and Prevention ("CDC"), Americans living with disabilities are at higher risk for severe illness from COVID-19 and, therefore, are recommended to shelter in place throughout the duration of the pandemic.[1] This underscores the importance of access to online retailers, such as Defendant, for this especially vulnerable population.

4.      During these challenging times, disabled individuals risk losing their jobs, experiencing difficulty acquiring goods and services like health care, and being deprived of the information they need to stay safe. *See* Slate, *The Inaccessible Internet 2020, available at* https://slate.com/technology/2020/05/disabled-digital-accessibility-pandemic.html (last accessed January 17, 2023).

5.      At the same time, the share of Americans who own smartphones has climbed from just 35% in 2011 to 81% in 2019—amounting to more than 265 million people in the United States. *See* U.S. Census Bureau, U.S and World Population Clock, *available at* https://www.census.gov/popclock/ (last accessed January 17, 2023) (U.S. population on June 12, 2019 was 328.1 million).

6.      In this climate, it is especially important to consider factors that can facilitate or impede technology adoption and use by people with disabilities. National Council on Disability,

---

[1] *See* Centers for Disease Control and Prevention Digital Platform, *Coronavirus Disease 2019 (2019), available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html (last accessed January 17, 2023) ("Based on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19.").

*National Disability Policy: A Progress Report* (Oct. 7, 2016), *available at* https://ncd.gov/sites/default/files/NCD_ProgressReport_ES_508.pdf (last accessed January 17, 2023).

7.     Properly formatted, digital content is universally accessible to everyone. But when it is not, ineffective communication results. In those situations, legally blind individuals must unnecessarily expend additional time and effort to overcome communication barriers sighted users do not confront. These barriers may require the assistance of third parties or, in some cases, may deny outright access to the online service. *See* Kasey Wehrum, Inc., *Your Digital Platform is Scaring Customers Away. 5 Easy Ways to Fix It* (Jan. 2014), *available at* https://www.inc.com/magazine/201312/kasey-wehrum/how-to-get-online-customers-to-complete-purchase.html (last accessed January 17, 2023).

8.     Screen access "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 17-CV-767, 2017 WL 6542466, at *6 (E.D.N.Y. Dec. 21, 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use digital platforms. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring his to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.

> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a digital platform by listening and responding with his keyboard.

*Id*. at *6-7.[2]

9.    Unfortunately, here Airgas fails to communicate effectively with Ms. Blachowicz because its digital properties are not properly formatted to allow legally blind users such as Ms. Blachowicz to access its digital content. Accordingly, legally blind customers such as Ms. Blachowicz are deprived from accessing information about Airgas' products and using its online services, all of which are readily available to sighted customers.

10.    The United States Department of Justice Civil Rights Division has recently provided "Guidance on Web Accessibility and the ADA."[3] It states in part, "the Department has consistently taken the position that the ADA's requirements apply to all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web."

11.    This lawsuit is aimed at providing legally blind users like Ms. Blachowicz a full and equal experience.

## **PARTIES**

12.    Plaintiff Karen Blachowicz is, and at all times relevant hereto has been, legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101et seq., N.Y. Exec. Law § 296, *et seq*., and the laws of New York. Plaintiff has retinitis pigmentosa, a degenerative retinopathy disease which has progressed over many years. She suffered a stroke in 2014, which sped up the degenerative process significantly, and she is now close to totally blind. Plaintiff uses an iPhone 7 and a desktop computer which runs the Windows 10 operating system and the most recent version

---

[2]    *See* American Foundation for the Blind, *Screen Readers*, *available at* https://www.afb.org/node/16207/screen-readers (last accessed January 17, 2023) (discussing screen readers and how they work).
[3]    See ADA.Gov, *Guidance on Web Accessibility and the ADA*, *available at* https://beta.ada.gov/web-guidance/ (last accessed January 17, 2023 ("DOJ Guidance").

of JAWS. Plaintiff is a businesswoman who received a certification from Haughton College in 2009 in managing nonprofit organizations. Plaintiff is, and at all times relevant hereto has been, a resident of Buffalo, New York, located in Erie County.

13.     Defendant is a Delaware corporation with its principal place of business located at 259 North Radnor-Chester Road, Suite 100, Radnor, Pennsylvania 19087.  Defendant is a leader in the sale and distribution of welding equipment and safety products under its recognized brand name Airgas.

14.     Consumers may purchase Defendant's products and access other brand-related content and services at https://www.airgas.com/ ("Digital Platform"), the Digital Platform Defendant owns, operates, and controls.

15.     In addition to researching and purchasing Defendant's products and services from the comfort and convenience of their homes, consumers may also use Defendant's Digital Platform to contact customer service by phone and email, sign up to receive product updates, product news, and special promotions, review important legal notices like Defendant's Privacy Policy and Terms and Conditions, and more.[4]

16.     Defendant is responsible for the policies, practices, and procedures concerning the Digital Platform's development and maintenance.

17.     Because Defendant's Digital Platform is not and has never been fully accessible, and because upon information and belief Defendant does not have, and has never had, adequate corporate policies that are reasonably calculated to cause its digital properties to become and remain accessible, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seeks prospective injunctive relief requiring Defendant to:

---

[4]     *See, e.g.*, Defendant's Home Page, *available at* https://www.airgas.com/

a) Retain a qualified consultant acceptable to Plaintiff ("Web Accessibility Consultant") who shall assist in improving the accessibility of its Digital Platform, including all third-party content and plug-ins, so the goods and services on the Digital Platform may be equally accessed and enjoyed by individuals with vision related disabilities;

b) Work with the Web Accessibility Consultant to ensure all employees involved in Digital Platform and content development be given web accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages;

c) Work with the Web Accessibility Consultant to perform an automated accessibility audit on a periodic basis to evaluate whether Defendant's Digital Platform may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

d) Work with the Web Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on Digital Platforms, in addition to the testing, if applicable, that is performed using semi-automated tools;

e) Incorporate all of the Web Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

f) Work with the Web Accessibility Consultant to create a Web Accessibility Policy that will be posted on its Digital Platform, along with an e-mail address, instant messenger, and toll-free phone number to report accessibility-related problems;

g) Directly link from the footer on each page of its Digital Platform, a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Digital Platform to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Digital Platform;

h) Accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

i) Provide a notice, prominently and directly linked from the footer on each page of its Digital Platform, soliciting feedback from visitors to the Digital Platform on how the accessibility of the Digital Platform can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

j)  Provide a copy of the Web Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Digital Platform;

k)  Train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Digital Platform. Defendant shall have trained no fewer than 3 of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

l)  Modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Digital Platform to be inaccessible to users of screen reader technology;

m)  Plaintiff, her counsel, and their experts monitor the Digital Platform for up to two years after the Mutually Agreed Upon Consultant validates the Digital Platform is free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiff, through her counsel and their experts, shall be entitled to consult with the Web Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Digital Platform Accessibility Consultant provides Defendant.

18.     Digital platforms have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible digital platform will not cause the digital platform to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible digital platform has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the digital platform to remain accessible, the digital platform must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## **JURISDICTION AND VENUE**

19.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

20.     Defendant participates in the State's economic life by performing business over the Internet. Through its Digital Platform, Defendant entered into contracts for the sale of its products and services with residents of New York. These online sales contracts involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the Internet. *See Reed v. 1-800-Flowers.com, Inc.,* 327 F. Supp. 3d 539 (E.D.N.Y. 2018) (exercising personal jurisdiction over forum plaintiff's digital platform accessibility claims against out-of-forum digital platform operator); *Andrews v. Blick Art Materials, LLC,* 286 F. Supp. 3d 365 (E.D.N.Y. 2017) (same).

21.     Plaintiff Blachowicz was injured when she attempted to access Defendant's Digital Platform from her home in this District in an effort to shop for Defendant's products but encountered barriers that denied them full and equal access to Defendant's online goods, content, and services. Plaintiff Blachowicz is a small business owner and had wished to purchase protective footwear from Defendant. Unfortunately, she was unable to complete her purchase due to the inaccessibility of Defendant's Digital Platform.

22.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiff's claim occurred.

## FACTS APPLICABLE TO ALL CLAIMS

23.     While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, digital platform developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

## DEFENDANT'S ONLINE CONTENT

24.     Defendant's Digital Platform allows consumers to research and participate in Defendant's services and products from the comfort and convenience of their own homes.

25.     The Digital Platform also enables consumers to contact customer service by phone and email, sign up to receive product updates, product news, and special promotions, review important legal notices like Defendant's Privacy Policy and Terms and Conditions, and more.

26.     Consumers may use the Digital Platform to connect with Defendant on social media, using sites like Facebook, Twitter, LinkedIn, and YouTube.

## HARM TO PLAINTIFF

27.     Plaintiff attempted to access the Digital Platform from her home in Erie County, New York to purchase protective footwear. Unfortunately, because of Defendant's failure to build the Digital Platform in a manner that is compatible with screen access programs, Plaintiff is unable to understand, and thus is denied the benefit of, much of the content and services she wishes to access on the Digital Platform. The following are illustrative (but, importantly, not exhaustive) examples of a few of the accessibility barriers observed on the Digital Platform:

a.     Several critical elements are inaccessible on Defendant's Digital Platform such as the 'Search' field, the 'Cart' icon, and the 'Cart Count.' For example, when the screen-reader focus lands on the 'Search' field, it is simply announced as "text field." Similarly, the 'Cart' icon is simply announced as "zero link." Furthermore, when the screen-reader user adds an item to their shopping cart, the quantity of items in the cart is displayed onscreen. Unfortunately, this feature is not announced to the screen-reader user. Instead of hearing the quantity of products in their cart, the screen-reader user hears an announcement of "left paren link."



b.      When the user attempts to add an item to their shopping cart, a popup is displayed on screen which contains a quantity field. The user must enter the quantity of the product they wish to order before the item can be successfully added to the cart. Unfortunately, this feature is not accessible to screen-reader users. For example, when the screen-reader focus lands on the quantity field, it is announced simply as "1 text field." This prevents the screen-reader user from being able to add items to their shopping cart.



      c.       Users can download 'User Guides' for the products they wish to order that contain technical information about the products. Unfortunately, these PDF files are not accessible to screen-reader users. For example, in the 'Airgas Account Tool Bar' PDF, several images are displayed, but are not announced to the screen-reader user. Instead, the screen-reader user hears announcements of "image" for each of the images. None of the content in the images are announced to the screen-reader user causing them to miss out on important product information.



28.     These barriers, and others, deny Plaintiff full and equal access to all of the services the Digital Platform offers, and now deter her from attempting to use the Digital Platform to buy Defendant's goods and services. Still, Plaintiff would like to, and intends to, attempt to access the Digital Platform in the future to purchase the products and services the Digital Platform offers, or to test the Digital Platform for compliance with the ADA.

29.     If the Digital Platform was accessible, *i.e.* if Defendant removed the access barriers described above, Plaintiff could independently research and purchase Defendant's products and access its other online content and services.

30.     The law requires that Defendant reasonably accommodate Plaintiff's disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

31.     Plaintiff has been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and services in a manner that is compatible with screen reader technology.

## SUBSTANTIVE VIOLATIONS

### COUNT I

### Title III of the ADA, 42 U.S.C. § 12181 *et seq*.

32.     The assertions contained in the previous paragraphs are incorporated by reference.

33.     Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.

34.     Defendant is bound by the regulations implementing Title III of the ADA, which require that places of public accommodation ensure effective communication to individuals with disabilities. 28 C.F.R. § 303(c). *See also* DOJ Guidance (stating "[s]ince 1996, the Department of Justice has consistently taken the position that the ADA applies to web content.")

35.     Ms. Blachowicz is legally blind and therefore an individual with a disability under the ADA.

36.     Defendant is a place of public accommodation under the ADA because it is a "sales or rental establishment" and/or "other service establishment." 42 U.S.C. § 12181(7)(E), (F).

37.     Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. 42 U.S.C. § 12182; 28 C.F.R. §36.201.

38.     Defendant owns, operates, or maintains the Digital Platform.

39.     The Digital Platform is a service, facility, privilege, advantage, or accommodation of Defendant.

40.     Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the products, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. *See also* DOJ Guidance (explaining "[b]usinesses open to the public must take steps to provide appropriate communication aids and services (often called "auxiliary aids and services") where necessary to make sure they effectively communicate with individuals with disabilities.")

41.     Specifically, "[e]ven though businesses and state and local governments have flexibility in how they comply with the ADA's general requirements of nondiscrimination and effective communication, they still must ensure that the programs, services, and goods that they provide to the public—including those provided online—are accessible to people with disabilities." DOJ Guidance.

## SECOND CAUSE OF ACTION

### Violation of New York State Human Rights Law,

### Exec. Law, Article 15 § 290, *et seq*.

42.     The assertions contained in the previous paragraphs are incorporated by reference.

43.     Defendant's Digital Platform is a place of public accommodation within the definition of Article 15 of New York Executive Law, § 292. *See Andrews v. Blick Art Materials, Inc.*, 268 F. Supp. 3d 381, 398-99 (E.D.N.Y. 2017) (concluding a website is a public accommodation under New York State's Human Rights Law.)

44.     In the broadest terms, New York's Human Rights Law prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. Since Defendant does not provide Plaintiff with full and equal access to its Digital Platform, it has violated Article 15.

45.     More specifically, N.Y. Exec. Law § 296(2)(a) provides that it is "an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation … because of the … disability of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof."

46.     Defendant is subject to New York Human Rights Law because it owns and operates the Digital Platform. Defendant is a person within the meaning of N.Y. Exec. Law § 292(1).

47.      Defendant is violating N.Y. Exec. Law § 296(2)(a) in refusing to update or remove access barriers to its Digital Platform, causing its Digital Platform to be inaccessible to the visually impaired. This inaccessibility denies visually impaired consumers full and equal access to the facilities, goods and services that Defendant makes available to the non-disabled public.

48.     Specifically, under N.Y. Exec. Law § 296(2)(c)(I), unlawful discriminatory practice includes, "a refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities, unless such person can demonstrate that making such modifications would fundamentally alter the nature of such facilities, privileges, advantages or accommodations."

49.     In addition, under N.Y. Exec. Law § 296(2)(c)(II), unlawful discriminatory practice includes, "a refusal to take such steps as may be necessary to ensure that no individual with a disability is excluded or denied services because of the absence of auxiliary aids and services, unless such person can demonstrate that taking such steps would fundamentally alter the nature of the facility, privilege, advantage or accommodation being offered or would result in an undue burden."

50.     Making its online goods, content, and services compatible with screen readers does not change the content of Defendant's Digital Platform or result in making the Digital Platform different, but enables individuals with visual disabilities to access the Digital Platform Defendant already provides. This will not cause an undue burden on Defendant.

51.     Defendant's actions constitute willful intentional discrimination against Plaintiff on the basis of a disability in violation of the New York State Human Rights Law, N.Y. Exc. Law § 296(2) in that Defendant has:

      a.      constructed and maintained a Digital Platform that is inaccessible to Plaintiff, as a visually-impaired New York resident, with knowledge of the discrimination; and/or

      b.      constructed and maintained a Digital Platform that is not sufficiently intuitive and/or obvious such that is inaccessible Plaintiff, as a visually-impaired New York resident; and/or

      c.      failed to take actions to correct these access barriers in the face of substantial harm and discrimination to Plaintiff, as a visually-impaired New York resident.

52.     Defendant has failed to take any prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

53.     As such, Defendant discriminates, and will continue in the future to discriminate against Plaintiff on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, accommodations, and/or opportunities of https://www.airgas.com/ under § 296(2), *et seq.,* and/or its implementing regulations. Unless the Court enjoins Defendant from continuing to engage in these unlawful practices, Plaintiff will continue to suffer irreparable harm.

54.     The actions of Defendant were and are in violation of New York State Human Rights Law and therefore Plaintiff invokes her right to injunctive relief to remedy the discrimination.

55.     Plaintiff is also entitled to compensatory damages, as well as civil penalties and fines pursuant to N.Y. Exc. Law § 297(4)(c), *et seq.,* for each and every offense.

56.     Plaintiff is also entitled to reasonable attorneys' fees and costs.

57.     Pursuant to N.Y. Exec. Law § 297 and the remedies, procedures, and rights set forth and incorporated therein Plaintiff prays for judgment as set forth below.

**THIRD CAUSE OF ACTION**

**Violation of New York State Civil Rights Law,**

**NY CLS Civ R, Article 4 (CLS Civ R § 40, *et seq.*)**

58.     The assertions contained in the previous paragraphs are incorporated by reference.

59.     Plaintiff served notice thereof upon the attorney general as required by N.Y. Civil Rights Law § 41.

60.     N.Y. Civil Rights Law § 40 provides that "all persons within the jurisdiction of this state shall be entitled to the full and equal accommodations, advantages, facilities and privileges of any places of public accommodations, resort or amusement, subject only to the conditions and limitations established by law and applicable alike to all persons. No persons, being the owner, lessee, proprietor, manager, superintendent, agent, or employee of any such place shall directly or indirectly refuse, withhold from, or deny to any person any of the accommodations, advantages, facilities and privileges thereof …"

61.     N.Y. Civil Rights Law § 40-c(2) provides that "no person because of … disability, as such term is defined in section two hundred ninety-two of executive law, be subjected to any discrimination in his or her civil rights, or to any harassment, as defined in section 240.25 of the

17

penal law, in the exercise thereof, by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision."

62.     Defendant's Digital Platform is a place of public accommodation within the definition of N.Y. Civil Rights Law § 40-c(2). *See Andrews v. Blick Art Materials, Inc.*, 268 F. Supp. 3d 381, 398-99 (E.D.N.Y. 2017) (concluding a website is a public accommodation under New York State's Human Rights Law.)

63.     Defendant is subject to N.Y. Civil Rights Law because they own and operate https://www.airgas.com/. Defendant is a person within the meaning of N.Y. Civil Law § 40-c(2).

64.     Defendant is violating N.Y. Civil Rights Law § 40-c(2) in refusing to update or remove access barriers to its Digital Platform, causing its Digital Platform and the services integrated with the Digital Platform to be inaccessible to the visually-impaired. This inaccessibility denies visually impaired consumers full and equal access to the facilities, goods and services that Defendant makes available to the non-disabled public.

65.     Making its online goods, content, and services compatible with screen readers does not change the content of Defendant's Digital Platform or result in making the Digital Platform different, but enables individuals with visual disabilities to access the Digital Platform Defendant already provides. This will not cause an undue burden on Defendant.

66.     In addition, N.Y. Civil Rights Law § 41 states that "any corporation which shall violate any of the provisions of sections forty, forty-a, forty-b or forty two … shall for each and every violation thereof be liable to a penalty of not less than one hundred dollars nor more than five hundred dollars, to be recovered by the person aggrieved thereby…"

67.     Specifically, under NY Civ Rights Law § 40-d, "any person who shall violate any of the provisions of the foregoing section, or subdivision three of section 240.30 or section 240.31

18

of the penal law, or who shall aid or incite the violation of any of said provisions shall for each and every violation thereof be liable to a penalty of not less than one hundred dollars nor more than five hundred dollars, to be recovered by the person aggrieved thereby in any court of competent jurisdiction in the county in which the defendant shall reside …"

68.     Defendant has failed to take any prompt and equitable steps to remedy their discriminatory conduct. These violations are ongoing.

69.     As such, Defendant discriminates, and will continue in the future to discriminate against Plaintiff on the basis of disability. Because of Defendant's actions in maintaining an inaccessible Digital Platform, Plaintiff is being directly or indirectly refused, withheld from, or denied the accommodations, advantages, facilities and privileges thereof in § 40, *et seq.* and/or its implementing regulations.

70.     Plaintiff is entitled to compensatory damages of five hundred dollars per instance, as well as civil penalties and fines pursuant to N.Y. Civil Law § 40 *et seq.* for each and every offense.

<u>**PRAYER FOR DECLARATORY JUDGMENT AND
PROSPECTIVE INJUNCTIVE RELIEF**</u>

WHEREFORE, Plaintiff prays for:

(A)     A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, N.Y. Exec. Law § 296, *et seq.*, and the laws of New York, in that Defendant took no action that was reasonably calculated to ensure that its Digital Platform was fully accessible to, and independently usable by, individuals with visual disabilities;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a), N.Y. Exec. Law § 296, *et seq.*, and the laws of New York, which directs Defendant to

take all steps necessary to bring its Digital Platform into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Digital Platform is fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law, including the specific prospective injunctive relief described more fully in paragraph 17 above.

(C)     Payment of costs of suit;

(D)     Compensatory damages in an amount to be determined by proof, including all applicable statutory damages and fines, to Plaintiff for violations of her civil rights under New York State Human Rights Law;

(E)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment (*see Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191) ("Plaintiffs, as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), the fee petition may include costs to monitor Defendant's compliance with the permanent injunction."); *see also Access Now, Inc. v. LAX World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) (same);

(F)     Payment of nominal damages;

(G)     The provision of whatever other relief the Court deems just, equitable and appropriate; and

(H)     An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders in regard to the specific prospective injunctive relief described at paragraph 17 above.

Dated: January 17, 2023                          Respectfully Submitted,


                                                 */s/ Benjamin J. Sweet*
                                                 Benjamin J. Sweet
                                                 ben@nshmlaw.com
                                                 **NYE, STIRLING, HALE, MILLER, & SWEET LLP**
                                                 1145 Bower Hill Road, Suite 104
                                                 Pittsburgh, Pennsylvania 15243
                                                 Phone: (412) 857-5350

                                                 Jonathan D. Miller
                                                 jonathan@nshmlaw.com
                                                 **NYE, STIRLING, HALE, MILLER, & SWEET LLP**
                                                 33 W. Mission Street, Suite 201
                                                 Santa Barbara, California 93101
                                                 Phone: (805) 963-2345

                                                 *Attorneys for Plaintiff*